VAN ANTWERPEN, Circuit Judge,
concurring in part and dissenting in part.
To briefly recap: In December 2010, law enforcement officers, after consulting an Assistant United States Attorney, and in accord with the general policy of the United States Department of Justice, magnetically attached an independently battery *217 operated “slap on” Global Positioning System device (“GPS device” or “GPS”) upon the undercarriage of Harry Katzin’s vehicle, while that vehicle was parked on a public street. It was conceded at argument that the officers had probable cause to do so, although they did not obtain a warrant. For two days, law enforcement used that GPS to track the vehicle’s whereabouts on public roads. The vehicle never entered a private garage, never entered the curtilage of a home, nor did it enter a similarly private area. The information from that GPS then led to the seizure of evidence and the arrest of Harry Katzin and his two brothers, due to their involvement in a major ongoing scheme to steal drugs from Rite Aid pharmacies.
At that time, the Supreme Court, in cases involving electronic beepers in vehicles, had held that “[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” United States v. Knotts, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); see also United States v. Karo, 468 U.S. 705, 713-16, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). All but one of the United States Court of Appeals to have addressed the issue, in light of Knotts, Karo, and other general Fourth Amendment principles, held that GPS or similar electronic surveillance (“GPS-like device” or “GPS-like”) could be conducted in the same way that occurred here: without an authorizing warrant. This view was reflected in then-current Rule 41(b) of the Federal Rules of Criminal Procedure, the commentary to which stated that a warrant was not required to conduct electronic vehicle surveillance “[i]f ... the officers intend to install and use [an electronic surveillance] device without implicating any Fourth Amendment rights.” Fed.R.Crim.P. 41(b) advisory comm, note (2006). No decision from our Circuit was on point. Then came United States v. Jones, 565 U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012).
In light of the Supreme Court’s decision in Jones, and for the reasons discussed in the majority opinion, I agree that the Fourth Amendment now requires law enforcement officers to obtain a warrant, issued upon probable cause, before they install a GPS or a GPS-like device on a person’s automobile, or other mobile property, and thereafter use that device to conduct continuing surveillance. See Majority Opinion (“Maj.Op.”) at 197.[1]
I disagree, however, with the majority’s conclusion that the District Court was correct to suppress the evidence obtained as a result of the warrantless GPS installation and subsequent surveillance. See Maj. Op. at 204-14. Given pre-Jones Supreme Court precedent, the consensus regarding GPS and GPS-like use across the federal courts, and other relevant considerations, I would hold that the law enforcement officers here acted “with an objectively ‘reasonable good-faith belief that their conduct [was] lawful.” Davis v. United States, 564 U.S. -, 131 S.Ct. 2419, 2427, 180 L.Ed.2d 285 (2011) (quoting United States v. Leon, 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). For that reason, suppression in this case is unwarranted, and I would reverse the District Court.
I.
It is indisputable that the installation and use of the GPS device in this case was a “search” under the Fourth Amendment. See Jones, 132 S.Ct. at 949. Furthermore, I agree with the majority that this particu *218 lar search now requires a warrant, and that because the law enforcement officers here acted without a warrant a violation of the Fourth Amendment occurred. But “[t]he fact that a Fourth Amendment violation occurred ... does not necessarily mean that the exclusionary rule applies.” Herring v. United States, 555 U.S. 135, 140, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009); United States v. Tracey, 597 F.3d 140, 151 (3d Cir.2010). See also Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (“[W]hether the exclusionary rule’s remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.”).
The exclusionary rule “is a ‘prudential’ doctrine,” Davis, 131 S.Ct. at 2426 (quoting Pa. Bd. of Probation and Parole v. Scott, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)), utilized to “compel respect for the constitutional guaranty” embodied in the Fourth Amendment, id. (quoting Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). See also United States v. Brown, 631 F.3d 638, 646 (3d Cir.2011) (“[T]he exclusionary rule is merely a ‘judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.’ ” (quoting United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974))). Suppression of evidence obtained through a violation of the Constitution is “ ‘not a personal constitutional right,’ nor is it designed to ‘redress the injury’ occasioned by an unconstitutional search.” Davis, 131 S.Ct. at 2426 (quoting Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). And introduction of illegally obtained evidence at trial “work[s] no new Fourth Amendment wrong.” Calandra, 414 U.S. at 354, 94 S.Ct. 613. Instead, the exclusionary rule’s “sole purpose ... is to deter future Fourth Amendment violations.” Davis, 131 S.Ct. at 2426.
But application of the exclusionary rule is not warranted “in every circumstance in which it might provide marginal deterrence.” Herring, 555 U.S. at 141, 129 S.Ct. 695 (quoting Scott, 524 U.S. at 368, 118 S.Ct. 2014). Suppression is prudent only where it would “result in appreciable deterrence.” Leon, 468 U.S. at 909, 104 S.Ct. 3405 (emphasis added) (quoting United States v. Janis, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)); see also Davis, 131 S.Ct. at 2426-27 (explaining that “[wjhere suppression fails to yield ‘appreciable deterrence,’ exclusion is ‘clearly unwarranted’ ” (omission omitted) (quoting Janis, 428 U.S. at 454, 96 S.Ct. 3021)); Herring, 555 U.S. at 141, 129 S.Ct. 695 (same); Arizona v. Evans, 514 U.S. 1, 11, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (same); Virgin Islands v. John, 654 F.3d 412, 417 (3d Cir.2011) (same). In other words, suppression is warranted only where its deterrence benefits outweigh the substantial social costs inherent in “precluding] consideration of reliable, probative evidence.” Scott, 524 U.S. at 364, 118 S.Ct. 2014; see also Davis, 131 S.Ct. at 2427 (“For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.”); Tracey, 597 F.3d at 151 (“To determine whether to apply the rule in a particular case, we weigh the benefits of the rule’s deterrent effects against the costs of exclusion.... ”).
The costs of suppression are substantial. “Exclusion exacts a heavy toll on both the judicial system and society at large.” Davis, 131 S.Ct. at 2427. “The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free — something that ‘offends basic concepts of the criminal justice system.’ ” Herring, 555 U.S. at 141, 129 S.Ct. 695 (quoting Leon, 468 U.S. at 908, 104 *219 S.Ct. 3405). But in addition to its “costly toll upon truth-seeking and law enforcement objectives,” Scott, 524 U.S. at 364-65, 118 S.Ct. 2014 (internal quotation mark omitted), “[¡Indiscriminate application of the exclusionary rule,” in some circumstances, “may well ‘generate disrespect for the law and administration of justice,’ ” Leon, 468 U.S. at 908, 104 S.Ct. 3405 (alteration omitted) (quoting Stone, 428 U.S. at 491, 96 S.Ct. 3037). Consequently, “[o]ur cases hold that society must swallow this bitter pill when necessary, but only as a ‘last resort.’ ” Davis, 131 S.Ct. at 2427 (quoting Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)).
Against these costs, “we weigh the benefits of the rule’s deterrent effects.” Tracey, 597 F.3d at 151. But we must fight any instinct to “ ‘reflexive[ly]’ appl[y]” the rule. Davis, 131 S.Ct. at 2427 (quoting Evans, 514 U.S. at 13, 115 S.Ct. 1185). The necessary analysis calls for a “rigorous weighing of [the] costs and deterrence benefits,” focusing primarily “on the ‘flagrancy of the police misconduct’ at issue.” Id. (quoting Leon, 468 U.S. at 911, 104 S.Ct. 3405). See also John, 654 F.3d at 417 (explaining that the exclusionary rule is “trigger[ed]” only where police conduct is “sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system” (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695)).
Of course, “the deterrence benefits of exclusion ‘vary with the culpability of the law enforcement conduct’ at issue.” Davis, 131 S.Ct. at 2427 (alteration omitted) (quoting Herring, 555 U.S. at 143, 129 S.Ct. 695). On the one hand, “[w]hen the police exhibit ‘deliberate,’ ‘reckless,’ or ‘grossly negligent’ disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.” Id. (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695); see also John, 654 F.3d at 418 (condoning suppression where police conduct was “ ‘deliberate, reckless, or grossly negligent’ ” (quoting Tracey, 597 F.3d at 151)). But on the other hand, “when the police act with an objectively ‘reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, ‘isolated’ negligence, the deterrence rationale loses much of its force, and exclusion cannot ‘pay its way.’ ” Davis, 131 S.Ct. at 2427-28 (citations and internal quotation marks omitted) (quoting Herring, 555 U.S. at 137, 129 S.Ct. 695; Leon, 468 U.S. at 909, 908 n. 6, 919, 104 S.Ct. 3405).
Under this so-called “good-faith” exception to the exclusionary rule, beginning with United States v. Leon, the Supreme Court has consistently ruled that the costs of suppression are not outweighed by the little, if any, deterrent benefit of suppressing evidence obtained “in [a] reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment.” Leon, 468 U.S. at 909 (quoting Gates, 462 U.S. at 255, 103 S.Ct. 2317 (White, J., concurring)); see also Evans, 514 U.S. at 11-12, 115 S.Ct. 1185 (“[W]here the officer’s conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way____” (alteration in original) (internal quotation mark omitted) (quoting Leon, 468 U.S. at 919-20, 104 S.Ct. 3405)); Illinois v. Krull, 480 U.S. 340, 348 — 49, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (“[E]vidence should be suppressed ‘only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.’ ” (quoting United States v. Peltier, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975))); Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405 (“[O]ur good faith inquiry is confined to *220 the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal____”). Under such circumstances, “a reasonable officer cannot have been expected to know that what he was doing was unconstitutional,” and, as a result, “he is unlikely to be discouraged in his actions by the knowledge that the fruits of his unconstitutional searches will be suppressed.” John, 654 F.3d at 417. Thus, at bottom, “the harsh sanction of exclusion ‘should not be applied to deter objectively reasonable law enforcement activity.’ ” Davis, 131 S.Ct. at 2429 (quoting Leon, 468 U.S. at 919, 104 S.Ct. 3405).
II.
Admittedly, the majority posits several pages focused on the balancing test outlined in Herring and Davis; the test which I describe at length above. See supra Part I. But while purporting to consider whether, “in light of all the circumstances in this case,” the law enforcement officers’ conduct “rises to the level of a ‘deliberate, reckless, or grossly negligent’ violation of the Fourth Amendment,” Maj. Op. at 211, the majority fragments its analysis by discussing whether Knotts and Karo and the cases from our sister circuits addressing GPS and GPS-like devices are “binding appellate precedent” under Davis.
Of course, the question of whether Davis’s specific holding — that is, that law enforcement reliance on “binding appellate precedent” qualifies as objective good-faith conduct — lingers in the background of this case. In the event the Government were arguing that the law enforcement officers here relied on “binding appellate precedent,” I would have no qualms with the majority addressing whether Knotts and Karo and the relevant cases from our sister courts properly qualified under that moniker. But, as the majority makes clear, that is not the Government’s argument.
Furthermore, although a seemingly reasonable analytical choice, the majority’s decision to first address whether those cases qualify as “binding appellate precedent” later infects the more general good-faith analysis. That is, the majority allows its conclusion that the “Beeper Cases” and the “OuNof-Cireuit GPS Cases” are not “binding appellate precedent” to emaciate the weight given to law enforcement reliance thereon in the more general good-faith analysis.
In effect, the majority’s search for Davis-like “binding appellate precedent” in this case places a heavy thumb on the scale in favor of suppression. Such an analysis does not comply with the Leon line of cases, which, since their inception, have time and again stated that the touchstone for the good-faith exception is “ ‘the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal’ in light of ‘all of the circumstances,’ ” Herring, 555 U.S. at 145, 129 S.Ct. 695 (quoting Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405); not whether the officers relied upon “binding appellate precedent,” or “some seemingly immutable authority or information,” as the majority implies. See Maj. Op. at 205; see also id. at 211 (“Try as we might to allay our concerns, we remain supremely discomfited by the lack of binding appellate guidance underlying the police action in this case.”).
At bottom, the majority claims that this case is “different.” The officers here acted “differently],” (and, thus, sufficiently culpable so as to justify application of the exclusionary rule), the majority concludes, because the officers relied on “non-binding precedent” from our sister circuits and “extrapolatefed] from, or analogized] to, existing case law” rather than seeking a warrant. Maj. Op. at 211. But the conclusion that this case is “different” results primarily from the majority’s prior deter *221 minations that analogous and non-binding precedent are materially “different” from the “binding appellate precedent” dealt with in Davis; and, thus, without “binding appellate precedent,” the rationale of Davis and the other good-faith cases do not apply.
I do not think this case is “different” from other cases involving the good-faith exception, where courts are presented with specific facts and particularities and then asked whether “a reasonably well trained officer would have known that the search [conducted] was illegal in light of all the circumstances.” Herring, 555 U.S. at 145, 129 S.Ct. 695 (internal quotation marks omitted) (quoting Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405). Davis is obviously important because the facts in that case-officer reliance on “binding appellate precedent” — are the most analogous of the Supreme Court’s several good-faith cases with which the Government, and we, have to work. Regardless, the predominant importance of Davis is its affirmation of deterrence and police culpability as the lynchpins of the exclusionary rule analysis. The majority thus erroneously elevates the “binding appellate precedent” language to its own good-faith test instead of treating it as a single consideration in the exclusionary rule analysis.
Nevertheless, “of great significance to the instant case,” the majority insists, “is the fact that in Davis the police relied on binding appellate precedent that ‘specifically authorize [d the] particular police practice.’ ” Maj. Op. at 207 (quoting Davis, 131 S.Ct. at 2429). Thus, the majority stresses, that Davis must be read as “extending] good faith protection only to acts that are explicitly sanctioned by clear and well-settled precedent.” Maj. Op. at 207. First, I take great issue with the majority’s suggestion that the good-faith exception was “extended]” by Davis, or any other case, “only” to the specific factual circumstances therein. Courts apply a single good-faith exception to either condone or condemn varying factual circumstances. See Davis, 131 S.Ct. at 2428 (“The Court has over time applied [the] ‘good-faith’ exception across a range of cases.”).
More importantly, the Davis dissent, other courts, and commentators do not read the Davis majority’s articulation of the good-faith exception as limited to only “binding appellate precedent.” See Davis, 131 S.Ct. at 2439 (Breyer, J., dissenting) (“[A]n officer who conducts a search that he believes complies with the Constitution but which, it ultimately turns out, falls just outside the Fourth Amendment’s bounds is no more culpable than an officer who follows erroneous ‘binding precedent.’ Nor is an officer more culpable where circuit precedent is simply suggestive rather than ‘binding,’ where it only describes how to treat roughly analogous instances, or where it just does not exist.”); United States v. Sparks, 711 F.3d 58, 63 (1st Cir.2013) (“The [Davis ] Court’s emphasis on the absence of police culpability could be read to imply that good-faith reliance on out-of-circuit appellate precedent is also acceptable.”); United States v. Baez, 878 F.Supp.2d 288, 294-95 (D.Mass.2012) (“Baez argues that Davis should be limited to its precise holding____ [But] th[at] interpretation is entirely too static.... It is apparent that both the majority opinion and the concurring and dissenting opinions anticipated the principles of Davis would be worked out in subsequent cases raising themes and variations.”); Orin S. Kerr, Fourth Amendment Remedies and Development of the Law: A Comment on Camreta v. Greene and Davis v. United States, 2011 Cato Sup.Ct. Rev. 237, 255 (2011) (“If the exclusionary rule solely concerns culpability ... its [sic] hard to see why binding precedent is required. Reliance on binding precedent seems inherently reasonable, but reliance is often reasonable *222 without binding precedent. A local police officer who conducts a search widely upheld among the circuits but not yet addressed by the [U.S. Court of Appeals] in his jurisdiction is no more culpable than an officer who conducts a search upheld only by his regional circuit. If the former has acted reasonably, then surely so has the latter.”).[2]
Finally, the majority argues that Davis itself forecloses the conclusion that law enforcement reliance on analogous or nonbinding out-of-circuit precedent could ever constitute good faith. Quoting language from Davis[3] the majority claims that the case explained that “its holding was limited to jurisdiction^] where the law was clearly settled.” Maj. Op. at 208 n. 17. But the language to which the majority refers, quoted in full at footnote 3, swpra, is pure dicta, responding not to an argument about what the good-faith exception should or should not apply to but to the policy concern that “applying the good-faith exception to searches conducted in reliance on binding precedent will stunt the development of Fourth Amendment law.” Davis, 131 S.Ct. at 2432; see also id. at 2433 (“[A]pplying the good-faith exception in this context will not prevent judicial reconsideration of prior Fourth Amendment precedents.”).[4] Furthermore, direct *223 ly preceding this brief discussion, the Court reiterated that the sole focus of the exclusionary rule is “deterrence of culpable law-enforcement conduct.” Id. at 2432-38.
In short, I disagree with the way the majority’s opinion reads to suggest that Davis alone answers the questions presented in this appeal. In Davis, the Court was presented with a unique set of facts to which its holding was expressly directed: officer reliance on “binding appellate precedent” later overruled. See Davis, 131 S.Ct. at 2429. Identified by both the concurrence and the dissent, Davis did not touch the questions of “whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled,” id. at 2435 (Sotomayor, J., concurring), or “where circuit precedent is simply suggestive rather than ‘binding,’ where it only describes how to treat roughly analogous instances, or where it just does not exist,” id. at 2439 (Breyer, J., dissenting).
Of paramount importance to this case is that the reasoning underlying Davis does address those questions. Davis and the Court’s good-faith jurisprudence teach us that we must look at the totality of the circumstances and ask whether, in light of those circumstances, the officers were acting with “deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights,” which would justify suppression, or, instead, whether they were acting “with an objectively reasonable good-faith belief that their conduct [was] lawful” or “involve[d] only simple, isolated negligence.” Davis, 131 S.Ct. at 2427-28 (citations and internal quotation marks omitted). For that reason, I disagree with the majority’s conclusion that authority falling outside the specific semblance of Davis is “different” and thus always insufficient to support a finding of good-faith in every circumstance.
In Davis, the Court explained that Leon “imported” the reasoning of United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) “into the good-faith inquiry.” Davis, 131 S.Ct. at 2432. In Peltier, border patrol agents conducted a stop-and-search of an automobile “within a reasonable distance from” the Mexican border pursuant to a federal statute, federal regulations promulgated in accordance with that statute, and a “continuous judicial approval” of “the statute and the ... policy” across the federal courts. Peltier, 422 U.S. at 540-42, 95 S.Ct. 2313. Although that statute and policy were overturned by the Court’s decision in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the Peltier Court refrained from applying the exclusionary rule. See id. at 542, 95 S.Ct. 2313.
Essential to the Peltier Court’s decision was the now-familiar reasoning that “evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.” Id. Especially relevant here, the Court stated that “unless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing statutory or constitutional norm.” Id.
Thus, if the logic of Peltier was “imported ... into the good-faith inquiry” as Davis states, 131 S.Ct. at 2432, then a “uniform treatment” of a particular law enforcement act by the federal judiciary or a “prevailing ... norm” can, in the proper circumstances, support a finding of good faith. See Herring, 555 U.S. at 145, 129 S.Ct. 695 (“ ‘[0]ur good-faith inquiry is *224 confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal’ in light of ‘all the circumstances.’ ” (quoting Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405)); cf. United States v. Duka, 671 F.3d 329, 347 n. 12 (3d Cir.2011) (noting that “[t]he objective reasonableness of the officers’ reliance on the statute ... is further bolstered by the fact that the particular provision at issue had been reviewed and declared constitutional by several [out-of-circuit] courts” (citing Davis, 131 S.Ct. at 2434)).
All in all, my problem with the method of the majority’s good-faith analysis is that it myopically focuses too much on the facts and narrow holdings of Davis and other good-faith cases, and considers too little, if at all, the reasoning and principles of law underlying those decisions. The majority’s analysis is a search for some sort of “immutable authority or information that justifies [the law enforcement officers’] course of action.” See Maj. Op. at 205. But the good-faith exception to the exclusionary rule is not limited to those circumstances. The good-faith inquiry, like other Fourth Amendment analyses, requires us to “slosh our way through the factbound morass of ‘reasonableness.’ ” Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).[5] The question is, and always has been, whether the officers acted with a “reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment.” Leon, 468 U.S. at 909, 104 S.Ct. 3405 (quoting Gates, 462 U.S. at 255, 103 S.Ct. 2317 (White, J., concurring)); see also Davis, 131 S.Ct. at 2427-28; Herring, 555 U.S. at 145, 129 S.Ct. 695; Evans, 514 U.S. at 11-12, 115 S.Ct. 1185; Krull, 480 U.S. at 348-49, 107 S.Ct. 1160. Davis answers “yes” to police actions taken in reliance on “binding appellate precedent.” Davis, 131 S.Ct. at 2429. See also Herring, 555 U.S. at 147-48, 129 S.Ct. 695 (answering “yes” where officers relied on an error in a police-maintained outstanding warrant database); Evans, 514 U.S. at 14-16, 115 S.Ct. 1185 (answering “yes” where officers relied on an error in court-maintained database); Krull, 480 U.S. at 349-50, 107 S.Ct. 1160 (answering “yes” where officers relied on a subsequently invalidated statute); Leon, 468 U.S. at 922, 104 S.Ct. 3405 (answering “yes” where officers relied on a subsequently invalidated warrant). What we are asked to answer is whether the result is the same when officers act in the circumstances in which they did here. As the following analysis shows, I answer that question in the affirmative.
III.
A.
Before determining if the officers in this case acted with an objectively reasonable belief that them conduct complied with the Fourth Amendment, we must first determine what, precisely, their conduct was. Jones lumps the police conduct that oc *225 curred here into a singular act, see Jones, 132 S.Ct. at 949 (installation of a GPS and its use to monitor a vehicle are a search), as does the majority. But before Jones, GPS or GPS-like surveillance was often treated as two distinct acts: (1) the installation of the GPS or GPS-like device, and (2) the subsequent surveillance of the automobile.[6] Thus, for the purpose of my exclusionary rule analysis, I find it appropriate to similarly separate the officers’ conduct here into those two distinct Fourth Amendment acts. See Sparks, 711 F.3d at 66-67 (bifurcating its exclusionary rule / good-faith exception analysis with regard to, first, the GPS’s installation and, second, its subsequent monitoring).[7]
B.
Application of the exclusionary rule depends on whether the officers, at the time they were acting, would have or should have known their installation of the GPS and their subsequent use of the GPS to track Harry Katzin’s vehicle were unconstitutional. See Krull, 480 U.S. at 348-49, 107 S.Ct. 1160. Relevant to this determination are the Supreme Court’s case law dealing with electronic surveillance and general searches of automobiles, subsequent treatment of GPS and GPS-like surveillance across the federal courts, and other considerations.
1.
United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) and United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) are the authorities most relevant to our analysis. In Knotts, Minnesota law enforcement officers utilized an electronic beeper to conduct surveillance on a vehicle driven by a man suspected to be part of an illegal narcotics operation. 468 U.S. at 277-80, 104 S.Ct. 3049. In determining the Fourth Amendment implications of that activity, the Court determined that the alleged search “amounted principally to the following of an automobile on public streets and highways.” Id. at 281, 104 S.Ct. 3049. The Court rejected the argument that this constituted a search under the Fourth Amendment, and held that “[a] person traveling in an automobile on public *226 thoroughfares has no reasonable expectation of privacy in his movements from one place to another.”[8] Id. Because when one drives an automobile on public roads, he “voluntarily convey[s] to anyone who
want[s] to look”[9] his location, progress, and route, he has no reasonable privacy interest in “whatever stops he ma[kes]” nor his “final destination” or otherwise. Id. at 281-82,104 S.Ct. 3049.[10]
*227 A little over a year later, the Court reaffirmed this conclusion in Karo. But Karo clarified that the use of beepers to monitor cars and other objects was not without limits. Only in situations in which officers employ electronic devices to obtain information that could otherwise be obtained by visual surveillance in public places are officers able to rely upon Knotts’s holding. See Karo, 468 U.S. at 713-16, 104 S.Ct. 3296. Thus, the use of a beeper to monitor objects within private residences implicates the Fourth Amendment and requires a warrant. See id. at 714, 717-18, 104 S.Ct. 3296.
What Knotts initially left undecided, however, was whether the installation of the beeper was a search under the Fourth Amendment. See Knotts, 460 U.S. at 279 n. **, 103 S.Ct. 1081; id. at 286, 103 S.Ct. 1081 (Brennan, J., concurring). In both Knotts and Karo, the officers themselves neither installed nor placed the beepers onto or into the vehicles. In Knotts, the officers, with the consent of a chemical manufacturing company, installed a beeper inside a container for chemicals. The company agreed that the next time a suspected narcotics manufacturer came to purchase chemicals, they would put the chemicals he purchased in that particular container. After purchasing the chemicals, the suspect willingly placed the bugged container into his car, allowing the police to easily monitor his movements. 460 U.S. at 278, 103 S.Ct. 1081. In Karo, the officers cooperated with a government informant so as to ensure that Karo, who was suspected of manufacturing narcotics, was similarly duped into purchasing a container of chemicals containing a beeper. Once the purchase had occurred, and Karo placed the container in his car, the officers utilized the beeper to monitor his movements. 468 U.S. at 708, 104 S.Ct. 3296.
Karo held that where officers arrange for a suspect to obtain an item containing a beeper, even if the suspect has no knowledge of the item’s foreign tenant, that transfer did not intrude upon that suspect’s reasonable expectations of privacy. Id. at 712, 104 S.Ct. 3296. In short, the transfer “created a potential for an invasion of privacy,” but the mere fact that officers arranged for a beeper to come into the possession of an individual or into an individual’s property “infringed no privacy interest.” Id. Moreover, Karo reasoned that “[a]t most, there was a technical tres *228 pass on the space occupied by the beeper.” Id. But the Court concluded that “[t]he existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated ..., for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.” Id. at 712-13, 104 S.Ct. 3296.[11] As a result, the Court held that “any impairment of ... privacy interests that may have occurred was occasioned by the monitoring of the beeper,” not its installation. Id. at 713, 104 S.Ct. 3296.[12]
Thus, at bottom, before Jones, Knotts and Karo established that no Fourth Amendment search occurred where officers use beeper-based electronics to monitor an automobile’s movements on public roads because a person has no reasonable expectation of privacy with regard to that information. But, because the facts of Karo correspondingly limited its holding, those cases did not address whether installation of a beeper onto or into a vehicle, in all circumstances, was a search. Nonetheless, Karo’s reasoning regarding the Fourth Amendment implications of a beeper installation on an automobile is telling, *229 and was certainly informative in the subsequent treatment of the issue throughout the federal courts.
Additionally, several other well settled Fourth Amendment principles are relevant. Before Jones, the Supreme Court had made perfectly clear that persons did not enjoy a reasonable expectation of privacy in the exterior of their automobiles. New York v. Class, 475 U.S. 106, 114, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); see also Cardwell v. Lewis, 417 U.S. 583, 591, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Similarly axiomatic were the principles that a simple “trespass” or “physical intrusion” alone, absent an infringement upon a reasonable expectation of privacy, was not a “search,” see supra Note 11; that information willingly conveyed to third parties, such as when a car “travels public thoroughfares where its occupants and its contents are in plain view,” Cardwell, 417 U.S. at 590, 94 S.Ct. 2464, retains no reasonable expectation of privacy, see supra Note 9; and that objects willingly placed or left in the “open fields,” regardless of whether those fields are trespassed upon, see Oliver, 466 U.S. at 177-80, 104 S.Ct. 1735, do not enjoy a reasonable expectation of privacy, see supra Note 10.
2.
After Knotts and Karo, what resulted was a uniform consensus across the federal courts of appeals to address the issue that the installation and subsequent use of GPS or GPS-like device was not a search or, at most, was a search but did not require a warrant. See, e.g., United States v. Marquez, 605 F.3d 604, 609-10 (8th Cir.2010) (reasoning that installation and use of GPS requires only reasonable suspicion, since monitoring on public roads is not a search); United States v. Pineda-Moreno, 591 F.3d 1212, 1215-16 (9th Cir.2010) (holding that GPS installation and use was not a search); United States v. Garcia, 474 F.3d 994, 997-98 (7th Cir.2007) (same); United States v. McIver, 186 F.3d 1119, 1126-27 (9th Cir.1999) (same); see also United States v. Michael, 645 F.2d 252, 256-58 (5th Cir.1981) (en banc) (holding that installation and use of beeper requires only reasonable suspicion, since monitoring on public roads is not a search).[13]
Most federal district courts, including the Middle District of Pennsylvania, had reached the same result. United States v. Jesus-Nunez, No. 1:10-cr-00017-01, 2010 WL 2991229, **3-5 (M.D.Pa. July 27, 2010) (“Since there was no Fourth Amendment search or seizure by the Government’s use of the GPS device, the court finds that the agents did not need probable cause or even reasonable suspicion to attach and monitor the [GPS] device to Defendant’s cars.”); e.g., United States v. Burton, 698 F.Supp.2d 1303, 1307-08 (N.D.Fla.2010); United States v. Moran, 349 F.Supp.2d 425, 467-68 (N.D.N.Y.2005).
The only case to break from this consensus was United States v. Maynard, 615 F.3d 544 (D.C.Cir.2010). In Maynard, the D.C. Circuit held that prolonged use of a GPS device to monitor the movements of defendant Jones’s vehicle “24 hours a day for four weeks,” was a “search” under the Fourth Amendment. 615 F.3d at 555. According to the D.C. Circuit, Knotts was not controlling of the question, as the court reasoned that Knotts’s holding endorsed only that “ ‘[a] person traveling in an automobile on public thoroughfares has no rea *230 sonable expectation of privacy in his movements from one place to another,’ not that such a person has no reasonable expectation of privacy in his movements whatsoever, world without end.” Id. at 557 (alteration in original) (citation omitted) (quoting Knotts, 460 U.S. at 281, 103 S.Ct. 1081). The court reasoned that the Supreme Court in Knotts, and the later cases across the courts of appeals, all “reserved” the issue of “whether ‘wholesale’ or ‘mass’ electronic surveillance of many individuals requires a warrant.” Id. at 558.[14]
As a result, the court concluded that although it may be “one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work,” it is a whole other thing “for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person’s hitherto private routine.” Id at 560. The court’s analysis in Maynard, therefore, was focused not on the installation of the device but rather the prolonged use of the GPS and the quality and quantity of information obtained over an extended period of time. Id. at 562 (“Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation.”).[15]
Other than Maynard only a handful of dissenting opinions questioned Knotts’s and Karo’s holdings or their applicability to GPS installation and subsequent surveillance. See Karo, 468 U.S. at 736, 104 S.Ct. 3296 (Stevens, J., dissenting) (“The impact of beeper surveillance upon interests protected by the Fourth Amendment leads me to what I regard as the perfectly sensible conclusion that absent exigent circumstances Government agents have a constitutional duty to obtain a warrant before they install an electronic device on a private citizen’s property.”); United States v. Pineda-Moreno, 617 F.3d 1120, 1124-26 (9th Cir.2010) (Kozinski, C.J., dissenting from denial of rehearing en banc) (arguing that GPS surveillance is a search because GPS devices “have little in common with the primitive devices in Knotts,” and provide officers “the power to track the movements of every one of us, every day of our lives”); Michael 645 F.2d at 260-70 (Tate, J., dissenting) (disagreeing with majority that “an individual living under our Constitution has no reasonable expectation of privacy such as would protect him from a trespass upon his property by governmental agents, a trespass that enables them to maintain continuous electronic surveillance *231 over his movements twenty-four hours per day continuously and indefinitely”).
3.
I also find several other considerations relevant. First, and most important, is Rule 41(b) of the Federal Rules of Criminal Procedure, which governs the issuance of warrants in all federal criminal proceedings. The 2006 Advisory Committee’s Note explains that Rule 41(b) was amended, in part, to “address the use of tracking devices.” Fed.R.Crim.P. 41(b) advisory comm, note (2006). In describing the ideal procedure, the Note states that “[warrants may be required to monitor tracking devices when they are used to monitor persons or property in areas where there is a reasonable expectation of privacy.” Id. (citing Karo, 468 U.S. 705, 104 S.Ct. 3296). Elaborating, the note instructs that “if the officers intend to install or use the device in a constitutionally protected afea, they must obtain judicial approval to do so.” Id. But, “[i]f, on the other hand, the officers intend to install and use the device without implicating any Fourth Amendment rights, there is no need to obtain the warrant.” Id. (citing Knotts, 460 U.S. 276, 103 S.Ct. 1081).
Moreover, the law enforcement officers consulted with an Assistant United States Attorney before conducting the installation of the GPS unit and the subsequent surveillance. {See Appellant Br. at 56.) I agree with the majority that “a government attorney’s approval, standing alone, cannot and should not suffice to demonstrate good faith.” Maj. Op. at 212 n. 23. But, as Appellees’ attorney conceded at oral argument, it is certainly another consideration to take into account in the good-faith analysis. {See Oral Arg. Trans, at 52: 4-6 (conceding that the officers’ reliance on the opinion of an Assistant United States Attorney was “a factor to look at” in determining whether the officers acted in good faith).) See also Tracey, 597 F.3d at 153 (concluding that approval from a government attorney, inter alia, was one consideration evidencing that “[a] reasonable officer would ... have confidence in the validity of the [search]”); United States v. Otero, 563 F.3d 1127, 1134 (10th Cir.2009) (same); United States v. Fama, 758 F.2d 834, 837 (2d Cir.1985) (same).
IV.
In my view, in light of the legal landscape discussed above, when the officers installed the GPS device[16] upon the undercarriage of Harry Katzin’s vehicle, and then used that device to monitor the vehicle’s movements for two days while it traversed public thoroughfares, those officers were acting with “an objectively ‘reasonable good-faith belief that their conduct [was] lawful.” Davis, 131 S.Ct. at 2427 (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405). I find that the officers’ actions in this case do not “exhibit ‘deliberate,’ ‘reckless,’ or ‘grossly negligent’ disregard for Fourth Amendment rights,” id. (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695), and, thus, “the deterrent value” of excluding the evidence found pursuant to the officers’ conduct would not “outweigh the resulting costs.” Id. Simply put, in this case, “exclusion cannot not ‘pay its way.’ ” Id. at 2428 (quoting Leon, 468 U.S. at 908 n. 6, 104 S.Ct. 3405).
*232 A.
The officers here were acting with an objectively reasonable good-faith belief that their warrantless installation of the GPS device upon the undercarriage of Harry Katzin’s automobile did not run afoul of the Fourth Amendment.
Based on fundamental Fourth Amendment principles which would have been familiar to any reasonably well trained law enforcement officer, there was no possibility that the officers, at the time they installed the GPS upon Harry Katzin’s vehicle, would have “had knowledge” — nor could we now “charge[ ] [them] with knowledge” — “that the search was unconstitutional under the Fourth Amendment.” Krull, 480 U.S. at 348-49, 107 S.Ct. 1160 (quoting Peltier, 422 U.S. at 542, 95 S.Ct. 2313).
Before Jones, the touchstone of any Fourth Amendment analysis was whether the Government had invaded upon a person’s reasonable expectation of privacy. See Katz, 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J., concurring); see also Bond v. United States, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000); California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). “[A]n actual trespass [was] neither necessary nor sufficient to establish a constitutional violation.” Karo, 468 U.S. at 713, 104 S.Ct. 3296 (emphasis added); see also supra note 11. As a result, a reasonably well trained law enforcement officer would have known that the installation of the GPS unit upon the undercarriage of Harry Katzin’s vehicle was a Fourth Amendment “search” only in the event that it was apparent that Harry Katzin had a reasonable expectation of privacy in that area.
Of course, Harry Katzin had a reasonable expectation of privacy with respect to the interior of his vehicle; even if that privacy interest was diminished. See Cardwell, 417 U.S. at 589-90, 94 S.Ct. 2464. But it would have been objectively reasonable for a law enforcement officer to conclude that he lacked a reasonable expectation of privacy in the exterior — specifically, the undercarriage — of the vehicle.
In Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) and again in New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), the Supreme Court made it quite clear that persons lack a reasonable expectation of privacy in the exterior of their automobiles. See Cardwell, 417 U.S. at 591-92, 94 S.Ct. 2464 (“With the search limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed.”); Class, 475 U.S. at 114, 106 S.Ct. 960 (plurality opinion) (“The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a ‘search.’ ” (citing Cardwell, 417 U.S. at 588-89, 94 S.Ct. 2464)). In light of this long-standing Supreme Court precedent, the officers would have had an “objectively reasonable good-faith belief’ that Harry Katzin lacked a reasonable expectation in the exterior of his vehicle, and thus that “their conduct was lawful” when they installed the GPS on the car’s undercarriage. Davis, 131 S.Ct. at 2427 (internal quotation mark omitted).[17]
*233 Again, I make no claim that Class or Cardwell qualify as “binding appellate precedent” under Davis. That does not end the inquiry, however. Instead, what resolves the inquiry is that, in light of the pre-Jones legal landscape, the law enforcement officers here could have reasonably concluded that Supreme Court precedent authorized, or at the very least affirmed the constitutionality of, their conduct. Regardless of the alternate facts in Class and Cardwell, those eases’ holdings and principles of law, which would have been known by a reasonably well trained law enforcement officer, made it clear that before Jones a person lacked a reasonable expectation of privacy in the exterior of his automobile, and, thus, a simple trespass thereupon by law enforcement officers would not have constituted a “search.” As a result, I cannot conclude that the law enforcement officers’ conduct in installing the GPS device to the undercarriage of Harry Kaztin’s vehicle was a “ ‘deliberate,’ ‘reckless,’ or ‘grossly negligent’ disregard of Fourth Amendment rights.” Davis, 131 S.Ct. at 2427 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695).
B.
Similarly, the officers here were acting with an objectively reasonable good-faith belief that their warrantless use of the GPS to monitor Harry Katzin’s vehicle while it traversed public roads over the course of two days was constitutionally permissible.
First, the majority distinguishes, and thus dismisses, Knotts and Karo on their facts. Paramount, the majority says, are that facts that “[njeither case involved a physical trespass onto the target vehicle; in both cases the police placed the beeper inside of a container which was then loaded into the target vehicle by the driver.... [and] both Karo and Knotts addressed the use of beepers, which ... are markedly different from GPS trackers.” Maj. Op. at 207. True, these factual distinctions would matter much if the Government were arguing that Knotts and Karo qualified as “binding appellate precedent” under Davis. But, as discussed above, that is not the Government’s argument. A reasonably well trained police officer, acting in December 2010, would have thought Knotts and Karo to have meant exactly what they said with regard to GPS and GPS-like surveillance. Those cases made absolutely clear that “[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another,” Knotts, 460 U.S. at 281, 103 S.Ct. 1081, because the “movements of the automobile” while on public roads “could have been observed by the naked eye.” See Karo, 468 U.S. at 713-14, 104 S.Ct. 3296. Thus, the Fourth Amendment simply was not implicated. See id.; see also Sparks, 711 F.3d at 65 (“After Knotts ... [it was] settled ... [that] using a beeper to monitor a person’s movements in a car on public roads did not implicate the Fourth Amendment, because there was no privacy interest to be infringed.”). At the time the officers were acting, Knotts’s holding was familiar and sacrosanct. See, e.g., Marquez, 605 F.3d at 609; Garcia, 474 F.3d at 996; McIver, 186 F.3d at 1126.
This may well be enough to justify the officers’ good faith in performing warrant-less GPS surveillance of Harry Katzin’s automobile. See Sparks, 711 F.3d at 66-67 (concluding good-faith exception applied to GPS surveillance because Knotts “clearly *234 authorized the agents to use a GPS-based tracking device”). But I need not answer that question, because “good faith” is determined in light of “all of the circumstances.” Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405; see also Herring, 555 U.S. at 145, 129 S.Ct. 695. In this case, in addition to Knotts and Karo, the officers were also guided, and reasonably relied, upon a “uniform treatment” of “continuous judicial approval” across the federal courts with regard to the constitutionality of warrant-less GPS use. See Peltier, 422 U.S. at 541-42, 95 S.Ct. 2313; see also Caleb Mason, New Police Surveillance Technologies and the Good-Faith Exception: Warrantless GPS Tracker Evidence After United States v. Jones, 13 NEV. L.J. 60, 65 (2012) (before Jones, “everyone thought” that the “key fact” from Knotts and Karo “was that the cars were being monitored while they were on public roads, where anyone could see them”). Specifically, nearly every federal court to consider the issue had concluded that a warrant was unnecessary to conduct GPS surveillance, the sole exception being Maynard [18]
Consequently, in light of Knotts and Karo, and their subsequent treatment, it was “objectively reasonable” for the law enforcement officers to have believed that the use of the GPS device to conduct surveillance upon Harry Katzin’s vehicle while it moved along public roadways was not a Fourth Amendment “search.” See Knotts, 460 U.S. at 282-83, 103 S.Ct. 1081 (explaining that where one “travel[s] over the public streets he voluntarily convey[s] to anyone who want[s] to look the fact that he [is] traveling over particular roads in a particular direction, the fact of whatever stops he ma[kes], and the fact of his final destination”); Ciraolo, 476 U.S. at 224, 106 S.Ct. 1809 (Powell, J., dissenting) (“Comings and goings on public streets are public matters, and the Constitution does not disable police from observing what every member of the public can see.”); id. at 215, 106 S.Ct. 1809 (majority opinion) (“The Fourth Amendment simply does not require the police traveling in the public ... to obtain a warrant in order to observe what is visible to the naked eye.”).
C.
Moreover, two additional considerations bolster my conclusion that the law enforcement officers here acted with “an objectively ‘reasonable good-faith belief that their conduct was lawful.’ ” Davis, 131 S.Ct. at 2427 (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405).
First is the fact that the warrantless installation of the GPS device and its subsequent surveillance complied with the commentary to Rule 41(b) of the Federal Rules of Criminal Procedure, which states that “[i]f ... the officers intend to install and use [a GPS] device without implicating any Fourth Amendment rights, there is no need to obtain [a] warrant.” Fed. R.CrimP. 41(b) advisory comm, note (2006). As discussed, it was objectively reasonable for the officers to have concluded that Harry Katzin lacked a reasonable expectation of privacy in the undercarriage of his automobile, and the GPS device was never used to conduct surveillance in any area but the public roadways upon which the car was traveling. Thus, a reasonable reading of this commentary would have led to the equally reasonable conclusion that the officers here did not require a warrant to act.[19]
*235 Second, the law enforcement officers consulted with an Assistant United States Attorney before conducting the installation of the GPS unit and the subsequent surveillance. (See Appellant Br. at 56.) More than likely, that attorney’s discussion with the officers about the constitutionality of their conduct proceeded along similar lines as my analysis above. But, important for our purposes, the fact that the officers consulted with a government attorney before acting, who then approved their desired course of action, although certainly not dispositive on its own, is a consideration weighing in favor of the conclusion that “[a] reasonable officer would ... have confidence in the validity of the [search].” Tracey, 597 F.3d at 153; see also Otero, 563 F.3d at 1134; Fama, 758 F.2d at 837.
Thus, taking into consideration the Supreme Court jurisprudence, the near unanimous treatment by the federal courts to have addressed the issue, the commentary to Rule 41(b) of the Federal Rules of Criminal Procedure, and the fact the officers here consulted with an Assistant United States Attorney, it is clear that the officers were not acting with “ ‘deliberate,’ ‘reckless,’ or ‘grossly negligent’ disregard of Fourth Amendment rights,” Davis, 131 S.Ct. at 2427 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695), when they conducted the warrantless installation and subsequent surveillance of the GPS device upon Harry Katzin’s automobile, but were instead acting with “an objectively ‘reasonable good-faith belief that their conduct [was] lawful.’ ” Id. (quoting Leon, 468 U.S. at 909,104 S.Ct. 3405).
V.
The majority holds otherwise, because, in its view, the difference between the beepers used in Knotts and Karo and the GPS device used in this case is “one of kind, not degree,” Maj. Op. at 210 n. 20, which makes all the “difference].” Furthermore, the majority chides reliance on Knotts, Karo, and the relevant cases from our sister circuits because United States v. Maynard, which held that prolonged GPS surveillance was a search and did require a warrant, put the officers on notice “that such devices could ‘implicate] ... Fourth Amendment rights.’ ” Maj. Op. at 213 n. 24. I disagree that these two considerations render the officers’ conduct here objectively unreasonable and sufficiently culpable so as to incur the wrath of the exclusionary rule.
Certainly, the technological difference between the beepers of the 1980s and modern GPS devices is a consideration to take into account in determining whether the law enforcement officers were acting with an objectively reasonable belief their actions were lawful. Modern “GPS units do not require police to follow the suspect visually, do not allow the driver to detect tailing, and do not require an expensive deployment of equipment and manpower.” United States v. Hernandez, 647 F.3d 216, 221 (5th Cir.2011); see also Maynard, 615 *236 F.3d at 565 (opining that “practical considerations prevent visual surveillance from lasing [as] long” as “the use of the GPS in [that] case”); Pineda-Moreno, 617 F.3d at 1126 (Kozinski, C.J., dissenting from denial of rehearing en banc) (“[T]here’s no hiding from the all-seeing network of GPS satellites that hover overhead, which never sleep, never blink, never get confused and never lose attention.”).
Admittedly, this makes GPS devices different from the beepers used in Knotts and Karo. Beepers do not independently determine their geographic location, but, instead, “emit[] periodic signals that can be picked up by a radio receiver” within range of the beeper’s radio transmitter. See Knotts, 460 U.S. at 277, 103 S.Ct. 1081. Beepers thus aid law enforcement by assisting officers in visual surveillance of a suspect, rather than doing the work of the officer altogether. See Pineda-Moreno, 617 F.3d at 1124 (Kozinski, C.J., dissenting from the denial of rehearing en banc) (“[M]odern [GPS] devices ... can record the car’s movements without human intervention — quietly, invisibly, with uncanny precision.”).
Notwithstanding these technological differences, “[i]t is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence.” Karo, 468 U.S. at 712, 104 S.Ct. 3296. “Certainly, a GPS tracker is more capable than a beeper, ‘but nothing inheres in the technology to take it out of Knotts’s holding.’ ” Sparks, 711 F.3d at 66 (footnote omitted) (quoting United States v. Cuevas-Perez, 640 F.3d 272, 278 (7th Cir.2011) (Flaum J., concurring)); see also United States v. Andres, 703 F.3d 828, 835 (5th Cir.2013) (finding that “any possible technological differences between a 1981 ‘beeper’ and the GPS device” insufficient because the two devices’ “functionality [were] sufficiently similar”); United States v. Jones, 625 F.3d 766, 768 (D.C.Cir.2010) (Sentelle, C.J., dissenting from the denial of rehearing en banc) (“There is no material difference between tracking the movements of the Knotts defendant with a beeper and tracking the Jones appellant with a GPS.”).
Regardless of the technological differences, the GPS reported to law enforcement no more information than that which the officers could have obtained through pure visual surveillance. Jesus-Nunez, No. 1:10-cr-00017-01, 2010 WL 2991229, at *3; see also Cuevas-Perez, 640 F.3d at 275 (dismissing as immaterial the increased accuracy of GPS devices since “real-time information is exactly the kind of information that drivers make available by traversing public roads”). Every piece of data the GPS unit provided law enforcement officers could have been otherwise obtained by a police officer tracking Harry Katzin’s vehicle on foot or in his squad car on a public street;[20] by an officer keeping an eye on the vehicle through use of a telescope or binoculars, or utilizing a flashlight or spotlight so as to not lose the car under the shadow of the night;[21] or by an officer utilizing an airplane or a helicopter *237 to follow the vehicle along the public roadways.[22]
The efficiency or efficacy of an officer’s natural senses often benefit from advances in technology. See Dow Chem. Co. v. United States, 476 U.S. 227, 231, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (changes in technology not only “enhanee[] industrial process, and indeed all areas of life,” but “they have also enhanced law enforcement techniques”). But “[t]he mere fact that human vision is enhanced” by some form of technological advance, by itself, “does not give rise to constitutional problems.” Id. at 238, 106 S.Ct. 1819; see also Silverman v. United States, 365 U.S. 505, 513, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) (Douglas, J., concurring) (“[NJeither should the command of the Fourth Amendment be limited by nice distinctions turning on the kind of electronic equipment employed.”). Again, “[i]t is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence.” Karo, 468 U.S. at 712, 104 S.Ct. 3296. “Nothing in the Fourth Amendment prohibit[s] the police from augmenting the sensory facilities bestowed upon them at birth with such enhancement as science and technology afforded them in this case.” Knotts, 460 U.S. at 282, 103 S.Ct. 1081. The information obtained through use of the GPS was information otherwise observable by the naked eye. See id. at 281-82, 103 S.Ct. 1081. The GPS unit simply made it easier for the law enforcement officers to obtain. See id. at 284, 103 S.Ct. 1081 (“Insofar as respondent’s complaint appears to be simply that scientific devices such as beepers enabled police to be more effective in detecting crime, it simply has no constitutional foundation.”). And at the time the officers here acted, it was indubitable that Harry Katzin lacked any reasonable expectation of privacy in the information the GPS unit was procuring. See id at 281, 103 S.Ct. 1081.[23] Thus, even taking into consideration the technological difference between the beepers used in Knotts and *238 Karo and the GPS units used in this case, the officers were clearly not “exploit[ing]” GPS technology in a way so as to put them on notice that their actions were unconstitutional.[24] See Cuevas-Perez, 640 F.3d at 279-80 (Flaum, J., concurring) (opining before Jones that “[t]he holding of Knotts is that a person has no expectation of privacy in movements from one place to another on public roads; by its terms, the holding is indifferent to the technology used to observe those movements”).
Nor does the existence of United States v. Maynard, 615 F.3d 544 (D.C.Cir.2010) affect the officers’ reasonable belief that their conduct was lawful. First, the Maynard holding was based on the fact that the GPS surveillance conducted in that case lasted for four weeks, which allowed law enforcement to obtain “information not revealed by short-term surveillance.” See Maynard, 615 F.3d at 562; Cuevas-Perez, 640 F.3d at 274 (“[T]he Maynard court repeatedly distinguished the surveillance at issue there from surveillance during a single journey.”). Conversely, the GPS tracking in this case lasted for only two days, (see Appendix at 112-15, 143-50.), and Appellees make no argument that the information obtained by the GPS device “reveal[ed] more” about their personal lives “than does any individual trip viewed in isolation.” Maynard, 615 F.3d at 562.[25] Besides, “Knotts gave scant reason to *239 think that the duration of the tracking in that case was material to the Court’s reasoning.” Sparks, 711 F.3d at 67.[26]
Furthermore, consider this hypothetical: Imagine, under facts identical to our case, the D.C. Circuit’s Maynard decision was, instead, the only case holding that GPS use was not a search and did not require a warrant. If, under those circumstances, the officers claimed to rely only upon Maynard for a reasonable belief that their conduct complied with the Constitution, that consideration would weigh more toward a finding of law enforcement culpability. But, here, we are presented with the alternative, and Maynard was the only holding (i.e., not a dissent or concurring opinion) from any court at the time the officers executed the warrantless GPS surveillance that considered their conduct illegal. As a result, the fact that Appellees are pointing to Maynard as the only case that said the law enforcement officers could not do what they did is a consideration that weighs in the officers’ favor.
Under the majority’s rule, where law enforcement officers engage in “extrapolation] [of] their own constitutional rule,” or where officers “assum[e] that their own self-derived rule sanctions] their conduct,” those officers act with sufficient culpablity so as to justify application of the exclusionary rule. Maj. Op. at 212. I agree that “[t]he justifications for the good-faith exception [may] not extend to situations in which police officers have interpreted ambiguous precedent.” Sparks, 711 F.3d at 67 (quoting Davis, 598 F.3d at 1267). But that is not the case here, “where new developments in the law have upended the settled rules on which police relied.” Id. at 68.
Before Jones, all but one federal court of appeals to address the issue unequivocally concluded that Knotts, Karo, and other relevant Supreme Court precedent sanctioned the law enforcement conduct that occurred here. These Fourth Amendment principles, upon which the law enforcement officers relied in this case, were settled maxims of constitutional jurisprudence, some of them governing law enforcement conduct for decades. The majority, viewing this case through Jones-colored lenses, rules with the benefit of a hindsight that was unavailable to the officers here.
United States v. Jones changed things; and changed them in a way very few — if any at all — predicted. The exclusionary rule does not require us to punish the law enforcement officers here for failing to predict that sea change.[27] The District Court below put it quite aptly:
*240 [T]he Court hastens to emphasize that it has no concern that the prosecutorial and law enforcement personnel here were undertaking their work in this investigation and prosecution in a calculated or otherwise deliberately cavalier or casual manner in the hopes of just meeting the outer limits of the constitutional contours of the Katzins’ rights. Indeed, these actors could well profess surprise at the specific outcome of Jones.
United States v. Katzin, Crim. No. 11-226, 2012 WL 1646894, at *10 n. 15 (E.D.Pa. May 9, 2012). Regardless of this seemingly dispositive conclusion, the District Court found, and the majority now affirms, that the exclusionary rule requires suppression of the evidence obtained by such non-culpable law enforcement conduct.
Doing so renders the exclusionary rule a “strict-liability” regime, something which it emphatically is not. See Davis, 131 S.Ct. at 2429. The exclusionary rule is “a ‘prudential’ doctrine,” id. at 2426 (quoting Scott, 524 U.S. at 363, 118 S.Ct. 2014), which requires a “rigorous weighing of [the] costs and deterrence benefits,” id. at 2427, lest a “guilty and possibly dangerous defendant ] go[es] free,” Herring, 555 U.S. at 141, 129 S.Ct. 695. As a society, we willingly swallow that “bitter pill” when we must. Davis, 131 S.Ct. at 2427. But under the circumstances present in this case, I do not find the law enforcement conduct to be “sufficiently culpable” so that the benefit from deterring that conduct “is worth the price paid by the justice system,” John, 654 F.3d at 417, even if it might create a marginal incentive for officers to “err on the side of constitutional behavior.” United States v. Johnson, 457 U.S. 537, 561, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Marginal deterrence is not the trigger of the exclusionary rule, Herring, 555 U.S. at 141, 129 S.Ct. 695; law enforcement culpability, and, thus, the opportunity for appreciable deterrence is. Leon, 468 U.S. at 909, 104 S.Ct. 3405; John, 654 F.3d at 417. In consequence, because I find that the law enforcement officers here lacked the requisite culpability in their actions so as to justify applica *241 tion of the exclusionary rule, I respectfully dissent from the majority’s conclusion to the alternative. I would reverse the District Court below.

. I also agree with the majority that, under our decision in United States v. Mosley, 454 F.3d 249 (3d Cir.2006), each of the Katzin brothers has standing to seek suppression of the evidence obtained from Harry Katzin’s vehicle.

. The majority supports its limiting reading of Davis by pointing to the opinion below from the Eleventh Circuit, and several similar cases from our sister circuits, wherein courts "stress ... that [the] precedent on a given point must be unequivocal before [those courts would] suspend the exclusionary rule's operation.” United States v. Davis, 598 F.3d 1259, 1266 (11th Cir.2010); see also United States v. McCane, 573 F.3d 1037, 1045 (10th Cir.2009) ("Relying upon the settled case law of a United States Court of Appeals certainly qualifies as an objectively reasonable law enforcement behavior.”); United States v. Jackson, 825 F.2d 853, 866 (5th Cir.1987) ("The exclusionary rule should not be applied to searches which relied on Fifth Circuit law prior to the change of that law....”); id. at 878 (Hill, J., concurring) ("Outside of situations where we have authorized the specific conduct undertaken and then later declared it unconstitutional, I believe the analogy to Leon and Krull weakens and the exception should probably not be applied.”). But the Supreme Court refrained from creating a similar restraint. See Davis, 131 S.Ct. at 2435-36 (Sotomayor, X, concurring) (noting that Davis left “the markedly different question [of] whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled ... unanswered”). I therefore hesitate before reading into Davis a limitation apparently at odds with its rationale. See Kerr, supra at 255.

. The language quoted by the majority reads as follows:
This Court reviews criminal convictions from 12 Federal Courts of Appeals, 50 state courts of last resort, and the District of Columbia Court of Appeals. If one or even many of these courts uphold a particular type of search or seizure, defendants in jurisdictions in which the question remains open will still have an undiminished incentive to litigate the issue. This Court can then grant certiorari, and the development of Fourth Amendment law will in no way be stunted.
Davis, 131 S.Ct at 2433.

.As an aside, I fail to see how allowing law enforcement reliance on analogous or nonbinding out-of-circuit precedent to influence substantially the good-faith analysis would foreclose development of Fourth Amendment law. Leon made clear that "[t]here is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question [of] whether the Fourth Amendment has been violated.” 468 U.S. at 924, 104 S.Ct. 3430. “Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies” which federal courts are "empowered] ... to adjudicate”; and “courts have considerable discretion in conforming their decisionmaking processes to the exigencies of particular cases.” Id. at 924-25, 104 S.Ct. 3430.

. The majority insinuates that my analysis would "burden district courts with [an unwarranted] type of case-by-case assessment,” and create "a sprawling, amorphous, and self-contradicting doctrine.” Maj. Op. at 210. But all of the questions that the majority fears — i.e., "how many circuits had addressed the police practice in question, what each one said, whether the statements were mere dicta”; and "what if our sister courts had all ruled in near-unanimity on a point, with one stalwart (perhaps, highly persuasive) holdout?” — are exactly the sorts of questions we should be asking; particularly where the Supreme Court instructs us to answer the good-faith question by focusing on whether "a reasonably well trained officer would have known that the search [conducted] was illegal in light of all the circumstances.” Herring, 555 U.S. at 145, 129 S.Ct. 695 (internal quotation marks omitted) (quoting Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405).

. See, e.g., Karo, 468 U.S. at 711-13, 104 S.Ct. 3296 (analyzing Fourth Amendment implications of beeper installation); id. at 713-18, 104 S.Ct. 3296 (analyzing Fourth Amendment implications of beeper surveillance); Knotts, 460 U.S. at 280, 103 S.Ct. 1081 n.* * (certiorari granted on Fourth Amendment implications of beeper use and “pass[ing]” on the issue of beeper installation); United States v. Pineda-Moreno, 591 F.3d 1212, 1215-16 (9th Cir.2010) (analyzing GPS installation separately from GPS use); United States v. Moore, 562 F.2d 106, 111-12 (1st Cir.1977) (same, but with beepers).

. I pause to note that separating GPS use into these two distinct Fourth Amendment acts is not appropriate for determining whether a Fourth Amendment search has occurred. The Jones majority clearly rejected the concurrence’s suggestion that it do so. Compare Jones, 132 S.Ct. at 951 n. 5 (finding the distinction between GPS "installation” and "use” irrelevant for determining whether a Fourth Amendment "search” had occurred, reasoning "[a] trespass on 'houses' or 'effects,' or a Katz invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy”), with id. at 958 (Alito, J., concurring) (finding it a "questionable proposition that [the] two procedures cannot be separated for purposes of the Fourth Amendment analysis,” and reasoning that it is clear that both the “installation” and "use” of the GPS, on their own, do not constitute a search). But it is conceded that a search did occur in this case. My analysis focuses on an entirely different question; to wit: whether the officers would have known, at the time of their actions, that their conduct was a "search.” Because, as discussed in supra note 6, this question was often bifurcated at the time, my analysis proceeds accordingly.

.At the time, this holding was in accord many of the courts of appeals to have addressed the issue. A compelling number of courts found beeper surveillance did not implicate the Fourth Amendment. See, e.g., United States v. Michael, 645 F.2d 252, 257-58 (5th Cir.1981) (en banc) (holding “subsequent monitoring,” after installation of beeper upon reasonable suspicion, "did not violate ... reasonable expectation[s] of privacy”); United States v. Hufford, 539 F.2d 32, 33-34 (9th Cir.1976) (holding one's movements in his vehicle on a public road “were knowingly exposed to the public, and therefore are not a subject of Fourth Amendment protection”), partially overruled by Jones, 132 S.Ct. 945, as recognized by United States v. Pineda-Moreno, 688 F.3d 1087, 1091 (9th Cir.2012); cf. United States v. Bruneau, 594 F.2d 1190, 1196-97 (8th Cir.1979) (holding that “monitoring the airborne location of an aircraft with a [beeper] is not a search within the fourth amendment”); United States v. Clayborne, 584 F.2d 346, 350-51 (10th Cir.1978) (holding use of beeper “as a substitute for persistent extensive visual” surveillance, when it enters a “clandestine laboratory” exposed to “outside viewing” and “ingress and egress of the public” did not per se violate the Fourth Amendment).
Alternatively, some courts alluded that it implicated a person’s privacy interests, but did not hold such surveillance required a warrant. See, e.g., United States v. Moore, 562 F.2d 106, 111-12 (1st Cir.1977) (holding beeper surveillance requires probable cause, but no warrant), abrogated by United States v. Knotts, 460 U.S. 276, 286, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), as recognized by United States v. Sparks, 711 F.3d 58, 65 (1st Cir.2013) ("Knotts ... abrogated Moore’s probable cause requirement for beeper surveillance ....”); cf. United States v. Shovea, 580 F.2d 1382, 1387-88 (10th Cir.1978) (“The utilization of an electronic tracking device, without prior court approval, may be justified by probable cause and exigent circumstances.”). Conversely, a few cases did require a formal warrant; but many of those cases involved installations and surveillance occurring in private areas. See, e.g., United States v. Bailey, 628 F.2d 938, 944, 945-46 (6th Cir.1980). That was not the case in Knotts, nor is it the case here.
The Fifth Circuit at one time held that beeper surveillance plainly implicated the Fourth Amendment. See United States v. Holmes, 521 F.2d 859, 865-67 (5th Cir.1975) ("A person has a right to expect that when he drives his car into the street, the police will not attach an electronic surveillance device to his car in order to track him. Although he can anticipate visual surveillance, he can reasonably expect to be 'alone' in his car when he enters it and drives away.... The[] failure to obtain a warrant is fatal.”). But that view seems to have been abrogated, if not overruled, by later pre-Knotts cases. See Michael, supra.

. The proposition that one has no reasonable expectation of privacy in information willingly conveyed to third parties remains unquestioned. Smith v. Maryland, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (“This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.”); see also, e.g., California v. Greenwood, 486 U.S. 35, 40-41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (no reasonable expectation of privacy in garbage bags willingly left on street curb for pick up by third party). But see Jones, 132 S.Ct. at 957 (Sotomayor, J., concurring) ("[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.”).

. The Knotts Court also based its holding on the similarly well-established "open fields” doctrine, see Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp., 416 U.S. 861, 864-65, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974); United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924), stating the beeper’s ability to enhance visual surveillance was of no consequence. Knotts, 460 U.S. at 282, 103 S.Ct. 1081 (“Nothing in the Fourth Amend *227 ment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.”); see also Boyd v. United States, 116 U.S. 616, 628, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (" ‘The eye cannot ... be guilty of a trespass(quoting Entick v. Carrington, 95 Eng. Rep. 807 (K.B.1765))). Technological enhancements of purely visual surveillance have, since Knotts, received similar treatment. See Florida v. Riley, 488 U.S. 445, 488-52, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (aerial surveillance of interior of partially covered greenhouse from a helicopter 400 feet overhead is not a search); Dow Chem. Co. v. United States, 476 U.S. 227, 238-39, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (aerial photographs taken from an airplane over an industrial complex are not searches); California v. Ciraolo, 476 U.S. 207, 211-14, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (aerial surveillance of an open greenhouse from an airplane 1,000 feet overhead is not a search); Texas v. Brown, 460 U.S. 730, 739-40, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (using flashlight to look into car interior and open glove compartment at night is not a search). But see Kyllo v. United States, 533 U.S. 27, 33-34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (use of infrared light technology to detect heat waves radiating off a home is a search because that information “could not otherwise have been obtained without physical intrusion into a constitutionally protected area” and “the technology in question [was] not in general public use” (internal quotation marks omitted) (quoting Silverman v. United States, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1960))).

. Karo's conclusion that "an actual trespass is neither necessary nor sufficient to establish a constitutional violation” was, until Jones, sacrosanct in Fourth Amendment law. In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court turned Fourth Amendment questions away from their common-law trespass foundation. See 389 U.S. at 353, 88 S.Ct. 507 ("[T]he trespass doctrine ... can no longer be regarded as controlling.”). Thereafter, the Fourth Amendment touchstone was whether the government had intruded upon a person's reasonable expectations of privacy. See id. at 360, 88 S.Ct. 507 (Harlan, L, concurring); see also Jones, 132 S.Ct. at 950; United States v. Mosley, 454 F.3d 249, 253 (3d Cir.2006) (“[T]he Fourth Amendment’s protection against unreasonable searches is predicated on the invasion by the government of a person’s reasonable expectation of privacy....”). For instance, in Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the police officers undoubtedly trespassed upon the petitioner's property. But, because it was found that the officers were trespassing upon only the "open fields” of petitioner’s property, he could not "demand privacy” for activities conducted or incriminating evidence found upon that property. 466 U.S. at 177-78, 104 S.Ct. 1735. The vast consensus was, then, that a physical "trespass” — regardless of whether it would have been considered an actual "trespass” under the common law — became a "search” only when that trespass infringed upon a person’s reasonable expectation of privacy. See, e.g., Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (“[Cjapacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.”); United States v. Acosta, 965 F.2d 1248, 1256-57 (3d Cir.1992). Indeed, the courts of appeals addressing the Fourth Amendment implications of GPS and GPS-like installation after Knotts and Karo made little of the physical trespass that occurred when police installed devices directly upon automobiles, primarily because the invasion of privacy that occurred was minimal or non-existent. See United States v. Marquez, 605 F.3d 604, 609-10 (8th Cir.2010); United States v. Pineda-Moreno, 591 F.3d 1212, 1215 (9th Cir.2010); United States v. Garcia, 474 F.3d 994, 997 (7th Cir.2007); United States v. McIver, 186 F.3d 1119, 1126-27 (9th Cir.1999); see also United States v. Michael, 645 F.2d 252, 257-58 (5th Cir.1981).

. The Karo Court also rejected the argument that the transfer of the bugged container constituted a seizure, holding that no "possessory interest was interfered with in a meaningful way.” Karo, 468 U.S. at 712, 104 S.Ct. 3296; see also id. ("A 'seizure' of property occurs when 'there is some meaningful interference with an individual’s possessory interests in that property.' ”) (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). Later cases did not disturb this holding, see, e.g., United States v. Garcia, 474 F.3d 994, 996 (7th Cir.2007), and Appellees here do not allege the GPS installation or subsequent surveillance was a seizure.

. Michael was also the law in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (decisions of the Fifth Circuit prior to October 1, 1981 are binding on the Eleventh Circuit); United States v. Smith, 387 Fed.Appx. 918, 920-21 (11th Cir.2010) (unpublished) (citing United States v. Michael, 645 F.2d 252 (5th Cir.1981) to support the proposition that GPS installation was not a search).

. The Supreme Court in Knotts, in response to the argument that its holding would allow “twenty-four hour surveillance of any citizen of this country ... without judicial knowledge or supervision,” opined that "the 'reality hardly suggests abuse,' ” and suggested that "if such dragnet-type law enforcement practices ... should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable.” Knotts, 460 U.S. at 283-84, 103 S.Ct. 1081 (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 566, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)).

. I pause here to note that the majority characterizes Maynard as having held that the mere act of attaching a GPS device onto a person's vehicle for the purpose of conducting continual surveillance, alone, constituted a search. See Maj. Op. at 196-97; see also id. at 201 n. 9 (describing that Maynard "explained that warrantless installation of a GPS device by the police was per se unreasonable under the Fourth Amendment”). Such a characterization is unfaithful to the panel’s opinion, which explicitly tailored its holdings to the fact that the surveillance conducted in that case lasted for a month. See Maynard, 615 F.3d at 558, 560.

. By "installed the GPS device,” of course, I mean that the officers magnetically attached the "slap on" GPS device upon the undercarriage of Harry Katzin’s vehicle. That device was totally independent of the car, operating under its own power. Also, it was not physically installed onto the car using screws, adhesives, or otherwise. Its attachment was occasioned only magnetically. Thus, for the purpose of my analysis, I focus on those facts.

. The majority is correct to point out, in its brief discussion of Class 's applicability to our warrant analysis, that Jones dismissed Class's relevancy with regard to whether a search occurs where officers install and subsequently track a GPS device upon an automobile. See Maj. Op. at 204 n. 14. That does not mean, however, that Class and Cardwell are similarly irrelevant to our good-faith analysis. At the time the officers were acting, those two cases were generally understood to stand for the proposition that one lacks a reasonable expectation of privacy in the exterior of his automobile. See, e.g., Pineda-Moreno, 591 F.3d at 1215 ("[T]he undercarriage of a vehi *233 ele, as part of its exterior, is not entitled to a reasonable expectation of privacy.”); United States v. George, 971 F.2d 1113, 1119-20 (4th Cir.1992) ("There is thus little question in the aftermath of Cardwell and Class that one does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways.”).

. The majority claims that, under the logic of my analysis, Maynard should have put the law enforcement officers "on notice that [GPS] devices could implicate Fourth Amendment rights.” Maj. Op. at 213 n. 24 (alteration, omission, and internal quotation marks omitted). For the reasons set forth at infra Part V, I disagree.

. Although the Government neglected to argue this fact, similar arguments have been made in similar cases, including cases heard *235 by District Courts in this Circuit. See, e.g., United States v. Lopez, - F.Supp.2d -, -, C.A. No. 10-cr-67(GMS), 2013 WL 3212347, at *3 (D.Del. June 26, 2013); United States v. Wilford, — F.Supp.2d -, -, Crim. No. ELH-11-0258, 2013 WL 2552446, at *20 (D.Md. June 7, 2013). Furthermore, the majority claims this commentary is a codification of "nothing more than the unremarkable proposition that the police need not obtain a warrant if their action does not violate the Fourth Amendment.” Since Maynard put law enforcement “on notice” that GPS use could affect Fourth Amendment rights, the majority reasons, the Rule has no substantive effect on the good-faith analysis. Maj. Op. at 213 n. 24. Again, as I discuss at infra Part V, I do not read Maynard to have such an effect, and, thus, I am at a loss to see how a reasonably well trained law enforcement officer, acting at the time the officers did in this case, could have known that their actions "implicat[ed] ... the Fourth Amendment.”

. See California v. Greenwood, 486 U.S. 35, 41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) ("[T]he police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public.”); Texas v. Brown, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) ("The general public could peer into the interior of Brown’s automobile from any number of angles; there is no reason [the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen.”); Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection.”).

. See Brown, 460 U.S. at 739-40, 103 S.Ct. 1535 (plurality opinion) ("It is ... beyond dispute that [the officer’s] action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment.”); *237 United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927) ("For aught that appears, the cases of liquor were on deck and, like the defendants, were discovered before the motorboat was boarded. Such use of a searchlight is comparable to the use of a marine glass or a held glass. It is not prohibited by the Constitution.”).

. See Florida v. Riley, 488 U.S. 445, 448-449, 451-52, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (an officer "circling] twice over respondent's property in a helicopter at the height of 400 feet” was not a search because “the police may see what may be seen from a public vantage point where they have a right to be” (alteration and internal quotation marks omitted)); California v. Ciraolo, 476 U.S. 207, 213-14, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ("Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed.").

. Today, the question remains open as to whether Jones effectually abrogated Knotts's conclusion that persons lack any reasonable expectation of privacy in the information the GPS unit was procuring. The only question answered in Jones was whether a search had occurred through the installation and subsequent use of the GPS device. Thus, the Fourth Amendment implications of the information obtained by the GPS surveillance, alone, were not discussed. Jones did state that "Knotts noted the 'limited use which the government made of the signals from [that] particular beeper; and reserved the question whether 'different constitutional principles may be applicable’ to 'dragnet-type law enforcement practices’ of the type that GPS tracking made possible [in that case].” Jones, 132 S.Ct. at 952 n. 6 (citations omitted). But Justice Scalia’s opinion for the majority refrained from altering Knotts's conclusion that "the information obtained — the location of the automobile carrying the [beeper] on public roads ... — had been voluntarily conveyed to the public,” and was therefore not a search. Id. at 951-52. Nonetheless, five justices wrote or joined the concurring opinions in Jones, all of which seemed to endorse the so-called "mosaic” theory expressed in Maynard — which would unequivocally limit the holding in Knotts to apply in only short-term surveillance. See Orín Kerr, The Mosaic Theory of the Fourth Amendment, 111 Mich. *238 L.Rev. 311, 326 (2012). This question does not need to be answered today; but emphasizes the major shift caused by Jones in Fourth Amendment law, and the vastly different legal regime under which the law enforcement officers here were acting.

. The majority concludes otherwise, alluding that my preferred disposition would "leave [persons] at the mercy of advancing technology.” Maj. Op. at 211 n. 20 (citing Kyllo v. United States, 533 U.S. 27, 35-36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). This case is categorically distinct from Kyllo. In Kyllo, the officers utilized technology to observe infrared radiation, which is otherwise invisible to the naked eye. 533 U.S. at 29, 121 S.Ct. 2038. Furthermore, the officers utilized that technology in order to determine the relative temperature of the interior of a home, an area entitled to almost absolute protection under the Fourth Amendment. Id. at 29-30, 121 S.Ct. 2038; see also Florida v. Jardines, 569 U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.”). In contrast, the use of the GPS device in this case provided information otherwise observable by the naked eye on a public street. What is more, although the Court found it "foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology,” Kyllo made much of the fact that the technology used in that case was “not in general public use.” 533 U.S. at 33-34, 121 S.Ct. 2038. Alternatively, GPS technology is widespread, and one need look only on the dashboard of his vehicle or the screen of his cellular telephone to spot one. Kyllo's, concerns, of course, arise in all Fourth Amendment cases dealing with advanced technology. But it is safe to say that those concerns are not implicated by out facts.

. The majority claims this is a distinction without a point, because "when the police attached their GPS device to Harry Katzin’s van, they had no way of knowing when the next Rite Aid robbery would take place”; thus characterizing the GPS tracking here as “a long-term surveillance project.” See Maj. Op. at 212 & n. 22. But for purposes of whether a Fourth Amendment violation occurred it matters not what law enforcement officers could have done but what they did do. See Dow Chem. Co., 476 U.S. at 238 n. 5, 106 S.Ct. 1819 ("Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations. '[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.’ ” (alteration in original) (quoting Karo, 468 U.S. at 712, 104 S.Ct. 3296)); cf. United States v. Jacobsen, 466 U.S. 109, 122, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (“The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.”).

. The Knotts Court did say, however, that “if dragnet-type law enforcement practices” such as “twenty-four hour surveillance of any citizen of this country ... without judicial knowledge or supervision,” "should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable.” Knotts, 460 U.S. at 283-84, 103 S.Ct. 1081. But merely acknowledging that “different constitutional principles may be applicable” does not imply what those principles may be and how they impact the relevant analysis. See Shelby Cnty. v. Holder, 570 U.S. -, 133 S.Ct. 2612, 2637 n. 3, 186 L.Ed.2d 651 (2013) (Ginsburg, J., dissenting) ("Acknowledging the existence of 'serious constitutional questions’ does not suggest how those questions should be answered.” (citation omitted)). Nonetheless, I seriously doubt that the “dragnet-type law enforcement practices” referred to by the Knotts Court, whatever they may be, are akin to what occurred in this case, where law enforcement officers had evidence to suggest that Harry Katzin was a serious criminal; evidence his attorney admitted at argument gave rise to probable cause. (See Oral Arg. Trans, at 43:7-16.)

. I have serious reservations about the implications of the majority’s ruling in this case. Nevertheless, I admit my position might encourage some law enforcement officers to bend and twist existing precedent and legal *240 principles to their breaking points. In some cases, law enforcement "reliance” could be marginal at best.
But I have confidence that courts are aptly suited to discern the true "good-faith actors” from the bad; and that, in circumstances such as those presented in this case, we will be able to definitively answer the question of whether law enforcement officers were acting with objectively reasonable good faith. Rulings that officers come up short will help deter undesirable law enforcement conduct.
The majority recognizes that "applying existing precedential framework to subtle factual permutations is something that police officers — and other law enforcement personnel— do all the time." Maj. Op. at 214 n. 27. But while insisting that its opinion does not "curtail such practices,” the majority punishes the law enforcement officers in this case for performing that exact practice. There may not have been a case from our Circuit or the Supreme Court specifically detailing what the officers should have done in the particular circumstances presented here. But there were cases from the Supreme Court that came very close; close enough, in fact, that some of our sister courts found them to be controlling as precedents in situations similar to the case at bar.
Obviously there is not enough time, history, or reporter space to answer every single Fourth Amendment question. As a result, the exclusionary rule has developed to provide a remedy on the backend. Often the hurried judgments of an officer, however well intentioned, simply do not comply with constitutional rights. But as a matter of Fourth Amendment policy, I would rather allow the officer more freedom in performing his job— particularly where the answer to the "application of] existing precedential framework to subtle factual permutations” is so readily apparent as it was in this case — than protect courts from overly burdensome suppression motions. Ruling on suppression motions is part of our job.